TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
| --- | --- | --- |
| | : | |
| OPINION | : | |
| | : | No. 23-103 |
| of | : | |
| | : | December 19, 2023 |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| KARIM J. KENTFIELD | : | |
| Deputy Attorney General | : | |

The HONORABLE NICOLE ELLIOTT, DIRECTOR OF THE DEPARTMENT OF CANNABIS CONTROL, has requested an opinion on a question relating to interstate commercial cannabis activity.

## QUESTION PRESENTED AND CONCLUSION

Could state-law authorization, under an agreement pursuant to Chapter 25 of Division 10 of the Business and Professions Code, for medicinal or adult-use commercial cannabis activity, or both, between out-of-state licensees and California licensees "result in significant legal risk to the State of California under the federal Controlled Substances Act" within the meaning of Business and Professions Code section 26308(a)(4)?

Yes. State-law authorization for commercial cannabis activity between out-of-state licensees and California licensees could "result in significant legal risk to the State of California under the federal Controlled Substances Act" within the meaning of section 26308(a)(4) due to the risks of federal preemption of state law and criminal prosecution of state employees. Courts have disagreed about the scope of federal preemption in the cannabis context, and no court has ever considered a preemption challenge to a state law authorizing *interstate* cannabis sales. The law is also unsettled as to whether state officials could be federally prosecuted for implementing state law in this area.

1

23-103

# BACKGROUND

"California has been a pioneer" in the regulation of cannabis.[1]  For most of the twentieth century, California law prohibited cannabis distribution and possession.[2]  In 1996, however, California became the first State to eliminate criminal liability for medical cannabis use under state law.[3]  In that year, the voters approved Proposition 215, which authorized qualifying patients and their caregivers to possess or cultivate cannabis for a patient's personal medical use with the recommendation of a physician.[4]  California voters further liberalized the State's cannabis laws in 2016 by enacting Proposition 64, which legalized recreational cannabis use by adults.[5]  The initiative also authorized the State to regulate the cultivation, processing, distribution, and sale of cannabis for commercial purposes.[6]

Implementing these initiatives, the Legislature has created a comprehensive framework to regulate cannabis cultivation, distribution, manufacture, sale, and use within the State.[7]  The Business and Professions Code contains detailed rules governing all aspects of the cannabis lifecycle, including business licensing; cultivation; standards for manufacturing, packaging, and labeling; testing and quality assurance requirements;

---

[1] *Gonzales v. Raich* (2005) 545 U.S. 1, 5.  In 2017, the Legislature replaced all references to "marijuana" in the Health and Safety Code with the term "cannabis."  (See *People v. Raybon* (2021) 11 Cal.5th 1056, 1059, fn. 1, citing Stats. 2017, ch. 27, §§ 113-160.)  We will follow suit and use the term "cannabis" in this opinion, except when quoting sources that use different terminology.

[2] *Gonzales v. Raich*, *supra*, 545 U.S. at p. 5.

[3] See *People v. Kelly* (2010) 47 Cal.4th 1008, 1012-1013; *Gonzales v. Raich*, *supra*, 545 U.S. at p. 5.

[4] See Health & Saf. Code, § 11362.5; 86 Ops.Cal.Atty.Gen. 180 (2003); 88 Ops.Cal.Atty.Gen. 113 (2005).

[5] See Health & Saf. Code, § 11362.1; *People v. Boatwright* (2019) 36 Cal.App.5th 848, 853.

[6] See Bus. & Prof. Code, § 26000; Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 64, § 3, p. 179.  Today, 38 States, three territories, and the District of Columbia have legalized cannabis for medical purposes; 24 States, two territories, and the District of Columbia have legalized cannabis for recreational use.  (See National Conference of State Legislatures, State Medical Cannabis Laws, https://www.ncsl.org/health/state-medical-cannabis-laws (as of Dec. 19, 2023).)

[7] See Bus. & Prof. Code, § 26000 et seq. (the Medicinal and Adult-Use Cannabis Regulation and Safety Act).

2

delivery rules; restrictions on advertising and marketing; regulations of retail sales and distribution; and prohibitions on cannabis sales to minors.[8] To administer these rules, the Legislature created the Department of Cannabis Control, which has promulgated implementing regulations.[9] Cannabis commerce is taxed by the State, with proceeds funding regulatory enforcement.[10] Tax proceeds also finance myriad cannabis-related research and safety initiatives concerning substance abuse, youth education, highway safety, community development, and environmental remediation, among other issues.[11] Cannabis cultivation, distribution, or possession that does not comply with state rules and regulations remains prohibited by California law.[12]

While California and many other States have legalized cannabis under state law, cannabis production, distribution, and possession remain illegal under the federal Controlled Substances Act (CSA).[13] "Enacted in 1970 with the main objectives of combating drug abuse and controlling the legitimate and illegitimate traffic in controlled substances," the CSA "criminaliz[es] the unauthorized manufacture, distribution, dispensing, and possession of [controlled] substances."[14] The statute categorizes drugs into five schedules, grouping them based on their perceived risks and benefits.[15] Cannabis is classified as a Schedule I controlled substance, subjecting it to the most severe restrictions on access and use.[16] As a result, it is a federal crime to manufacture,

[8] See Bus. & Prof. Code, §§ 26050-26059 (licensing), §§ 26060-26066.2 (cultivation), §§ 26130-26131 (manufacturing, packaging, and labeling), § 26110 (quality assurance and testing), § 26090 (deliveries), §§ 26150-26156 (advertising and marketing), §§ 26070-26071 (retailers and distributors), § 26140 (sales to minors).

[9] See Bus. & Prof. Code, §§ 26010, 26013; Cal. Code Regs., tit. 4, § 15000 et seq.

[10] See Rev. & Tax Code, § 34010 et seq.; Rev. & Tax Code, § 34019; California Department of Tax and Fee Administration, Tax Guide for Cannabis Businesses, https://www.cdtfa.ca.gov/industry/cannabis.htm (as of Dec. 19, 2023).

[11] See Rev. & Tax Code, § 34019.

[12] See Health & Saf. Code, §§ 11357-11361; *People v. Boatwright*, *supra*, 36 Cal.App.5th at p. 853.

[13] See 21 U.S.C. § 801 et seq.

[14] *Gonzales v. Oregon* (2006) 546 U.S. 243, 250. Before the CSA's enactment, federal law "did not outlaw the possession or sale" of cannabis. (*Gonzales v. Raich*, *supra*, 545 U.S. at p. 11.) But it "practically curtailed" cannabis activities by imposing "prohibitively expensive taxes" and "onerous administrative requirements." (*Ibid.*)

[15] See 21 U.S.C. § 812.

[16] See *Gonzales v. Raich*, *supra*, 545 U.S. at pp. 14-15. The CSA defines Schedule I substances as having "a high potential for abuse," "no currently accepted medical use in

distribute, or possess cannabis in almost all circumstances.[17]  The statute contains no exception for medical use or for activity authorized by state law.[18]

Although cannabis possession and distribution remain illegal under federal law, federal enforcement has declined in States, like California, that have legalized cannabis use.  Beginning in 2009, the United States Department of Justice issued a series of memoranda stating that it would not be a departmental priority to prosecute cannabis activity that complied with state law.[19]  While the memoranda were revoked in 2018, courts and commentators have observed that the Department continues to "show[] little interest . . . in using federal resources to enforce" the CSA against state-authorized conduct.[20]  Moreover, for every fiscal year since 2015, Congress has passed an annual

treatment," and "a lack of accepted safety for use . . . under medical supervision."
(21 U.S.C. § 812, subd. (b)(1)(A)-(C).)  Congress placed cannabis on Schedule I when it enacted the CSA.  (See *Gonzales v. Raich*, *supra*, 545 U.S. at p. 14.)  Although the statute "provides for the periodic updating of schedules," previous "efforts to reschedule" cannabis have been unsuccessful.  (*Id.* at pp. 14-15.)  On August 29, 2023, the U.S. Department of Health and Human Services recommended for the first time that cannabis should be rescheduled to Schedule III.  (See Congressional Research Service, Department of Health and Human Services Recommendation to Reschedule Marijuana:  Implications for Federal Policy (Sept. 13, 2023), https://crsreports.congress.gov/product/pdf/IN/IN122 40 (as of Dec. 19, 2023)).  Because rescheduling would also require approval from the U.S. Drug Enforcement Administration, cannabis currently remains classified on Schedule I.  (See *ibid.*)

[17] See 21 U.S.C. §§ 841, subd. (a)(1), 844, subd. (a); 97 Ops.Cal.Atty.Gen. 21, 23 (2014). The statute contains a narrow exception for federally approved research studies.  (See *Gonzales v. Raich*, *supra*, 545 U.S. at p. 14.)

[18] See *United States v. Oakland Cannabis Buyers' Co-op.* (2001) 532 U.S. 483, 486.

[19] E.g., Memorandum For Selected United States Attorneys from David W. Ogden, Deputy Att'y Gen., *Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana* (Oct. 19, 2009); Memorandum For All United States Attorneys from James M. Cole, Deputy Att'y Gen., *Guidance Regarding Marijuana Enforcement* (Aug. 29, 2013) (Cole Memorandum).  For States that had implemented "strong and effective regulatory and enforcement systems," the memoranda directed that "the primary means of addressing" cannabis-related activity should be state-law enforcement.  (Cole Memorandum, at p. 3.)

[20] *In re State Question No. 807, Initiative Petition No. 423* (Okla. 2020) 468 P.3d 383, 392, fn. 5; see Mikos, *The Evolving Federal Response to State Marijuana Reforms* (2020) 26 Widener L. Rev. 1, 10 (revocation of the memoranda "did not actually change federal enforcement practices").

appropriations rider that prohibits the Department of Justice from using appropriated funds to "prevent [States] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."[21]  Federal appellate courts have construed the rider not only to bar the Department from suing States directly, but also to prohibit federal prosecution of activities carried out in compliance with state medical cannabis laws.[22]

Against the backdrop of federal prohibition, California has taken an incremental approach to legalizing cannabis under state law.  Relevant here, while California has authorized intrastate cannabis activity, it has continued to prohibit cannabis exports to other States.[23]  California's export ban has been motivated, in part, by a concern that authorizing shipments across state lines could attract heightened federal interest in enforcing the CSA.[24]  Other States have imposed similar export bans as well.[25]  As a result, California companies cannot currently engage in interstate cannabis commerce without violating state law.

Recent legislation could change that.  Senate Bill 1326—enacted September 18, 2022, and effective January 1, 2023—empowers the Governor to enter into interstate cannabis agreements with other States.[26]  Such agreements could authorize "medicinal or adult-use commercial cannabis activity, or both, between entities licensed under the laws of" the two States.[27]  If an interstate agreement were put in place, California-licensed

---

[21] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 531 (Dec. 29, 2022) 136 Stat. 4459, 4561 effective through Sept. 30, 2023; see Continuing Appropriations Act, 2024 and Other Extensions Act, Pub. L. No. 118-15, § 104 (Sept. 30, 2023) 137 Stat. 71, 74, effective through Nov. 17, 2023; Further Continuing Appropriations and Other Extensions Act, 2024, Pub. L. No. 118-22, § 101 (Nov. 17, 2023) 137 Stat. 112, generally effective through Feb. 2, 2024.

[22] See *United States v. McIntosh* (9th Cir. 2016) 833 F.3d 1163, 1175-1179; *United States v. Bilodeau* (1st Cir. 2022) 24 F.4th 705, 712-715.

[23] See Bus. & Prof. Code, § 26080, subd. (a).

[24] See Off. of Ass. Floor Analyses, 3d reading analysis of Sen. Bill No. 1326 (2021-2022 Reg. Sess.) Aug. 19, 2022, p. 3.

[25] See Off. of Ass. Floor Analyses, 3d reading analysis of Sen. Bill No. 1326 (2021-2022 Reg. Sess.) Aug. 19, 2022, p. 3.

[26] See Stats. 2022, ch. 396, §§ 1-5 (enacting Sen. Bill No. 1326), codified in relevant part at Bus. & Prof. Code, Div. 10, Ch. 25, §§ 26300-26308.

[27] Bus. & Prof. Code, § 26301, subd. (a).  The statute refers to companies licensed by a partner state as "foreign licensees."  (See Bus. & Prof. Code, § 26300, subd. (c).)  Like

businesses could engage in cannabis commerce with out-of-state licensees without violating California law.[28]

SB 1326 mandates that any such interstate agreement include a number of conditions to ensure compliance with California's comprehensive health and safety standards. An agreement must require the partner State to ensure that cannabis products imported into California "meet or exceed" California regulatory requirements, including: "public health and safety standards"; participation in California's "seed to sale" tracking system; testing, quality assurance, and inspection standards; packaging and labeling requirements; and marketing and advertising restrictions.[29] The partner State must agree to regulate advertising, labeling, and sales of California cannabis products imported into its State as well.[30] Partner States must also agree to "reasonably cooperate with California investigations concerning" out-of-state licensees, including by investigating allegations of regulatory noncompliance at California's request.[31] To avoid conflict with non-partner States, the agreement must prohibit transportation of cannabis products "through the jurisdiction" of any State "that does not authorize that transportation."[32] Agreements must also "provide for collection of all applicable taxes."[33]

Although SB 1326 took effect on January 1, 2023, the statute contains an important limitation: It provides that no agreement between California and another State to authorize interstate cannabis activity "shall . . . take effect unless" one of four conditions is satisfied.[34] The first three conditions involve changes to federal law or

---

the requestor, we will refer to such companies as "out-of-state licensees" for clarity.

[28] See Bus. & Prof. Code, § 26080, subd. (a) (prohibiting cannabis exports "[e]xcept as provided in Chapter 25," i.e., the chapter added by SB 1326), § 26301, subd. (a), § 26302, subd. (a). Two other States that have legalized cannabis—Oregon and Washington—have enacted similar legislation authorizing their Governors to negotiate interstate cannabis agreements. Neither State's law will take effect, however, unless federal law or policy is changed to allow interstate cannabis distribution between state-licensed businesses. (See An Act Relating to Interstate Cannabis Agreements, 2023 Wash. Sess. Laws. Ch. 264, § 2; An Act Relating to Cannabis, 2019 Or. Laws Ch. 464, § 3.)

[29] Bus. & Prof. Code, § 26303, subd. (a)(1)-(7).

[30] Bus. & Prof. Code, § 26303, subd. (b).

[31] Bus. & Prof. Code, § 26304, subd. (b).

[32] Bus. & Prof. Code, § 26301, subd. (a)(2)(B).

[33] Bus. & Prof. Code, § 26306.

[34] Bus. & Prof. Code, § 26308, subd. (a).

6

federal policy.[35]  The fourth condition, under Business and Professions Code section 26308(a)(4), is that the California Attorney General issues a qualifying "written opinion, through the process established pursuant to Section 12519 of the Government Code."[36]  The opinion must conclude that "state law authorization, under an agreement pursuant to this chapter, for medicinal or adult-use commercial cannabis activity, or both, between foreign licensees and state licensees will not result in significant legal risk to the State of California under the federal Controlled Substances Act."[37]  The opinion must be "based on review of applicable law, including federal judicial decisions and administrative actions."[38]

The Department of Cannabis Control submitted this opinion request to obtain a legal opinion that would satisfy section 26308(a)(4)—and thereby enable the Governor to begin entering into interstate agreements.[39]  Mirroring the statutory language, the request asks whether state-law authorization of interstate commercial cannabis activities between licensed cannabis businesses could "result in significant legal risk to the State of California under the federal Controlled Substances Act."[40]  The requestor included a legal analysis explaining why, in its view, it would not.  For the reasons that follow, we cannot agree.

## SUMMARY

The question presented here—whether state-law authorization of interstate cannabis activities could result in significant legal risk to the State—is atypical for an opinion request under Government Code section 12519.  Our charge under section 12519

---

[35] The first two conditions are (i) that federal law "is amended to allow for the interstate transfer of cannabis or cannabis products between authorized commercial cannabis businesses" or (ii) that federal law is enacted to "specifically prohibit[] the expenditure of federal funds to prevent" such activities.  (Bus. & Prof. Code, § 26308, subd. (a)(1)-(2).)  The third condition is that the U.S. Department of Justice "issues an opinion or memorandum allowing or tolerating" interstate cannabis distribution.  (Bus. & Prof. Code, § 26308, subd. (a)(3).)

[36] Bus. & Prof. Code, § 26308, subd. (a)(4).  Government Code section 12519 authorizes enumerated state and local officials to request the Attorney General's written opinion "upon any question of law relating to their respective offices."

[37] Bus. & Prof. Code, § 26308, subd. (a)(4).

[38] Bus. & Prof. Code, § 26308, subd. (a)(4).

[39] See Department of Cannabis Control, letter to former Senior Assistant Attorney General Mollie Lee, Jan. 27, 2023 (Request for Opinion).

[40] Request for Opinion, at p. 1; see Bus. & Prof. Code, § 26308, subd. (a)(4).

7

is limited to addressing "question[s] of law."[41]  But an assessment of "legal risk" may turn on various non-legal considerations—such as the likelihood that a future federal administration would sue the State, or the likelihood that a future Congress would appropriate funds to support such a suit.  For this reason, we would ordinarily decline to analyze the degree of legal risk resulting from a proposed course of action.  In this case, however, the Legislature has enacted a statute—Business and Professions Code section 26308(a)(4)—that not only invites the Attorney General to assess the State's "legal risk," but also gives that assessment binding legal effect.  In this highly unusual circumstance, we will endeavor to answer the question presented.  But mindful of our statutory charge to analyze only questions of law, we will limit our analysis to the legal issues embedded in the question.

We begin by considering what types of adverse outcomes are relevant to the "legal risk" inquiry.  Applying ordinary tools of statutory construction, we construe the phrase "legal risk to the State of California under the federal Controlled Substances Act" in section 26308(a)(4) to refer to the possibility of the State bearing a loss, injury, or other adverse circumstance that is founded on the CSA.  In our view, one such circumstance would be if the CSA were deemed to preempt SB 1326—i.e., if a court declared California's law without effect under the Supremacy Clause of the United States Constitution.  Preemption of SB 1326 would prevent California from carrying out its preferred policy of authorizing and carefully regulating interstate cannabis activities.  And the State could be a defendant in a preemption suit, forced to appear in court and expend resources defending its laws.  If a court held SB 1326 preempted, the State could also be ordered to pay the plaintiff's attorneys' fees.

Although there are strong arguments against preemption here, the arguments in favor of preemption are sufficiently plausible that we cannot conclude that the legal risk is insignificant.  On the one hand, most courts have held that the CSA does not preempt state laws authorizing and regulating *intrastate* cannabis activities.  Consistent with those authorities, a court could reasonably conclude that California's authorization of *interstate* activities would not be preempted either.  Under the federal Constitution, Congress cannot compel California to maintain its existing state-law prohibition on interstate commercial cannabis sales.  And California's health and safety regulation of cannabis imports and exports would arguably advance, not hinder, the objectives underlying federal law by minimizing the worst harms associated with cannabis trafficking.  On the other hand, some courts and dissenting judges have concluded that state laws authorizing intrastate cannabis activities are preempted because they stand as an obstacle to the CSA's objective of eliminating all cannabis distribution and use.  In light of those

_____

[41] Gov. Code, § 12519; see also 62 Ops.Cal.Atty.Gen. 150, 163 (1979) ("The function of this office is not to resolve factual disputes, or disputes as to conflicting inferences which may arise from such facts, but to render opinions on legal questions"); 105 Ops.Cal.Atty.Gen. 39, 39 (2022).

23-103

authorities, we cannot conclude that the likelihood of a court holding SB 1326 preempted is so low as to be insignificant—especially since no court has ever considered preemption in the context of interstate sales. And while there may be reasons to believe that preemption litigation would be unlikely to arise in practice, we are not in a position to make political or economic predictions about whether the United States or another party would be likely to sue.

Finally, we analyze an additional risk: that state officials who implement SB 1326 could be federally prosecuted for violating the Controlled Substances Act. The requestor believes that such a prosecution is unlikely, both because state officials would not satisfy the elements of a CSA violation and because officials would be shielded from liability by the CSA's immunity provision. We agree that state officials would have strong arguments that they cannot be held criminally liable for carrying out their official duties. We acknowledge, however, that some state and federal authorities could support a theory of liability in these circumstances. We therefore conclude that the possibility of state employees facing criminal prosecution further increases the State's legal risk here— reinforcing our conclusion that state-law authorization for commercial cannabis activity between out-of-state licensees and California licensees could "result in significant legal risk to the State of California under the federal Controlled Substances Act" within the meaning of section 26308(a)(4).

## ANALYSIS

### What is the scope of the opinion request?

We begin by considering an important threshold question: what does Business and Professions Code section 26308(a)(4) mean by a "significant legal risk to the State of California under the federal Controlled Substances Act"? The statute itself does not define the relevant terms. Applying the ordinary tools of statutory interpretation, we therefore look to dictionary definitions.[42]

As relevant here, "risk" is defined as "the possibility of loss, injury, or other adverse or unwelcome circumstance."[43] The adjective "legal" means "founded on or deriving authority from law."[44] The relevant law here is the federal Controlled Substances Act. And the only legal risk we are concerned with is risk "to the State of

---

[42] See *Brennon B. v. Superior Ct.* (2022) 13 Cal.5th 662, 673 (the "fundamental task" in statutory interpretation "is to determine the Legislature's intent so as to effectuate the law's purpose" by examining the statutory language and "giving it a plain and commonsense meaning"); *id.* at p. 674 (looking to dictionary definitions).

[43] Oxford English Dict. (updated through Dec. 2023) ["risk"].

[44] Oxford English Dict. (updated through Dec. 2023) ["legal"].

California."  Putting this all together, the phrase "legal risk to the State of California under the federal Controlled Substances Act" refers to "the possibility of loss, injury, or other adverse or unwelcome circumstance" borne by the State that is "founded on" the CSA.[45]

Applying this construction, we believe that relevant legal risks include the possibility that California's laws authorizing interstate cannabis activities could be deemed preempted by the Controlled Substances Act—that is, declared "without effect" under the Supremacy Clause.[46]  In our view, such a result would constitute an "adverse or unwelcome circumstance" for the State.[47]  By invalidating California law in this area, preemption would prevent the State from carrying out its preferred policy of authorizing and carefully regulating interstate commercial cannabis activity.[48]  If a court were to hold that SB 1326 is preempted, the State would also suffer the "loss" of any resources it had already expended implementing the statutory regime—costs that the Legislature expected to be "significant."[49]  And the State could be haled into court and forced to expend

---

[45] We note that several potential legal issues are beyond the scope of the question presented.  Because the question is limited to risk under the Controlled Substances Act, we will not analyze other possible challenges to SB 1326—for example, whether the Legislature's authorization of cannabis exports could conflict with the 2016 voter initiative that legalized only *intrastate* cannabis activity.  (See Assem. Com. on Business and Professions, Rep. on Sen. Bill No. 1326 (2021-2022 Reg. Sess.) as amended June 6, 2022, p. 9.)  Also, given that we are concerned only with legal risk to the State, our analysis does not turn on the potential federal criminal liability of *private* actors who choose to engage in interstate commercial cannabis activities in accordance with state law.  And because the question asks only about liability from *authorizing* interstate cannabis activities, we need not consider whether the State's *failure* to authorize such activities could prompt legal challenges—such as claims that the current ban on cannabis exports runs afoul of the dormant Commerce Clause.  (See, e.g., *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine* (1st Cir. 2022) 45 F.4th 542 [applying the dormant Commerce Clause to state cannabis laws].)

[46] *Mut. Pharm. Co. v. Bartlett* (2013) 570 U.S. 472, 475.  We need not resolve in this opinion whether any other types of legal risk fall within the scope of section 26308(a)(4).  Our conclusion that preemption could pose a significant legal risk to the State is sufficient to answer the question presented.

[47] Oxford English Dict. (updated through Dec. 2023) ["risk"].

[48] Cf. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez* (1982) 458 U.S. 592, 601 (noting a State's "sovereign interest[]" in exercising "power over individuals and entities" within its jurisdiction, including "the power to create and enforce a legal code").

[49] See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No.

23-103

further resources defending its laws.[50]  If a court held SB 1326 preempted, the State could also be required to pay the plaintiff's attorneys' fees.[51]

The legislative history of SB 1326 further supports our conclusion that preemption is a relevant risk.  In the final legislative hearings, the senators presenting the bill stated that the section 26308(a) conditions were included to minimize the possibility of "conflict between the State of California and the federal government."[52]  Such a conflict could be premised on preemption:  the United States could sue California seeking to enjoin enforcement of SB 1326 on the theory that it is preempted by the CSA.  Indeed, the United States has previously brought similar suits against the State in other contexts.[53]

We acknowledge that the requestor would read the statute differently.  In a footnote in its request letter, the Department of Cannabis Control argues that the risk of preemption is not a legal risk to the State itself because the *mechanism* by which Congress preempts state laws is through "a federal law that regulates the conduct of private actors, not the States."[54]  Here, for instance, the potential source of preemption—

---

1326 (2021-2022 Reg. Sess.) as amended Aug. 18, 2022, p. 8 (describing cost estimates to implement the bill).

[50] See McCormick, *Legal Risk in the Financial Markets*, at p. 21 (2d ed. 2010) ("Legal risk . . . is commonly understood to relate to the risk of being sued or being the subject of a claim or proceedings"); Arnott, *Report On The International Bar Ass'n Symposium On Legal Risk* (2004) 4 J. Int'l Banking & Financ. Law 1 (legal risk includes "the risk for [an entity] of having a legal claim . . . brought against it").

[51] See Code Civ. Proc., §§ 1021.5, 1028; *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, as modified (Jan. 12, 2005); *Maria P. v. Riles* (1987) 43 Cal.3d 1281.

[52] Sen. Floor, Hearing on Sen. Bill. No. 1326 (Aug. 25, 2022), Sen. Caballero, at 2:09:20 (statement of bill author that, under section 26308(a), "interstate cannabis agreements . . . cannot go into effect until there is an appropriate assurance that the agreements will not cause conflict between the State of California and the federal government"); see Assem. Floor, Hearing on Sen. Bill. No. 1326 (Aug. 22, 2022), Sen. Berman, at 3:51:01 (similar); see also, e.g., *Kenna v. U.S. Dist. Ct. for C.D.Cal.* (9th Cir. 2006) 435 F.3d 1011, 1015-1016 (discerning legislative intent from uncontested floor statements of bill sponsors).

[53] E.g., *United States v. California* (9th Cir. 2019) 921 F.3d 865, 886-888 (alleging preemption of California law under the Immigration and Nationality Act).  In addition, as discussed below, preemption challenges to SB 1326 could potentially be raised by parties other than the United States.  For example, California counties have previously sued the State alleging that the CSA preempts other state cannabis laws.  (See *Cnty. of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 813-818.)

[54] Request for Opinion, at p. 4, fn. 4, quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*

11

23-103

the Controlled Substances Act—regulates the conduct of private actors by prohibiting them from distributing or possessing cannabis. But where a federal statute has preemptive effect, the *result* is to "nullify" affected state statutes and regulations—leaving them without legal effect.[55]

A comment letter submitted by the California Cannabis Authority agrees with our conclusion that preemption is a relevant risk.[56] That letter argues that the key legal risk under Business and Professions Code section 26308(a)(4) is that "the federal government will bring an action against the State of California challenging" SB 1326 on the ground that it is "preempted by the CSA."[57] The letter explains why, in the Authority's view, the State's laws would not be preempted.[58] Like us, however, the Authority views preemption as a cognizable form of "legal risk" for purposes of section 26308(a)(4).[59]

Having identified CSA preemption as a relevant legal risk under section 26308(a)(4), we next consider how to determine if that risk is "significant." As we have

_____

(2018) 138 S.Ct. 1461, 1481. As discussed in more detail below, Congress lacks the authority under the Constitution to directly command the States to enact (or refrain from enacting) legislation. But where Congress regulates the conduct of private actors, it has the power to preempt—i.e., invalidate—conflicting state laws under the Supremacy Clause.

[55] *Nathan Kimmel, Inc. v. DowElanco* (9th Cir. 2002) 275 F.3d 1199, 1203; see *Mut. Pharm. Co. v. Bartlett*, *supra*, 570 U.S. at p. 475 (preemption leaves state laws "without effect").

[56] See California Cannabis Authority, letter to Deputy Attorney General Karim J. Kentfield, Apr. 4, 2023 (California Cannabis Authority Comment). The California Cannabis Authority is "a Joint Powers Authority created by California Counties." (*Id.* at p. 1.) The Authority "assist[s] local governments in efficiently and effectively deploying resources for commercial cannabis oversight and taxation," while "promoting the functioning of a legal cannabis marketplace." (*Ibid.*)

[57] California Cannabis Authority Comment, at pp. 2-3.

[58] See California Cannabis Authority Comment, at pp. 4-6.

[59] Another comment letter similarly argues that the Legislature's "principal[] concern[]" in including the section 26308(a) conditions was to avoid "legal action, by the federal administration, against the State of California." (Rural County Representatives of California and California State Association of Counties, letter to Deputy Attorney General Karim J. Kentfield, Mar. 28, 2023, at p. 5 (Rural County Representatives Comment).) As explained above, a potential basis for such an action would be a claim that the State's laws are preempted by the CSA.

concluded in other contexts, "significant" does not mean "more likely than not."[60] Rather, the Oxford English Dictionary defines "significant" as "[s]ufficiently great or important to be worthy of attention; noteworthy; consequential, influential."[61] Reflecting the term's imprecision, other dictionaries offer alternative definitions, including "having or likely to have influence or effect"[62]; "deserving to be considered," "important," "weighty"[63]; and "[h]aving or likely to have a major effect," "[f]airly large in amount or quantity."[64] Applying any of these definitions, we believe that the *consequences* of the legal risk we have identified—preemption of state law—would be "significant."[65]

But what about the *likelihood* of preemption—i.e., is there a "significant" probability that preemption litigation would arise and that a court would ultimately conclude that SB 1326 is preempted?[66] As discussed above, we will analyze that question by considering the underlying "question[s] of law."[67] Specifically, we will evaluate whether the legal arguments in favor of preemption are sufficiently plausible that the risk of a court adopting them would be "significant." Given that some courts have determined that laws authorizing *intrastate* cannabis activities are preempted—and no court has ever considered a law authorizing *interstate* sales—we conclude that the legal risk is "significant."

---

[60] See 93 Ops.Cal.Atty.Gen. 104, 108 (2010) (a "significant" clash of loyalties in Government Code section 1099(a)(2) is a "modest standard," requiring a conflict that is not "trivial" and is "more certain than mere chance"); 101 Ops.Cal.Atty.Gen. 81, 85-86 (2018).

[61] Oxford English Dict. (updated through Sept. 2023) ["significant"].

[62] Merriam-Webster's Collegiate Dict. (11th ed. 2020) p. 1159 ["significant"].

[63] Webster's New Internat. Dict. (3d ed. 1976) p. 2116 ["significant"].

[64] American Heritage Dict. (5th ed. 2016) p. 1630 ["significant"].

[65] Moreover, to the extent there is meaningful variation among the definitions, we see no basis to selectively adopt one or another. Rather, in keeping with the Legislature's cautious approach—authorizing interstate cannabis activities, as relevant here, only if the Attorney General can rule out the possibility that "significant" legal risk would result—we believe it is appropriate to issue an opinion of no "significant" risk only if we conclude that the risk would not be significant under any conventional definition of the term.

[66] See International Organization for Standardization (2002), defn. 3.1.1 (defining "risk" as the "combination of the probability of an event and its consequences").

[67] Gov. Code, § 12519.

13

**Is there a significant risk that a court would hold that the Controlled Substances Act preempts California's laws authorizing interstate cannabis activity?**

The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land," "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[68]  Because "federal law is supreme in case of a conflict with state law," Congress may preempt state laws through federal legislation, thereby leaving them without legal effect.[69]  In evaluating preemption claims, "the purpose of Congress is the ultimate touchstone."[70]

The U.S. Supreme Court has identified three types of preemption:  express, field, and conflict.[71]  First, express preemption arises when Congress includes a preemption provision in the statute that "define[s] explicitly the extent to which its enactments pre-empt state law."[72]  Second, field preemption occurs when a "federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation."[73]  Third, conflict preemption arises when state law "actually conflicts with federal law."[74]  A conflict can occur in two ways:  either "where it is impossible for a private party to comply with both state and federal requirements" (impossibility

---

[68] U.S. Const., art. VI, cl. 2.

[69] *Murphy v. Nat'l Collegiate Athletic Ass'n*, *supra*, 138 S.Ct. at p. 1479; see *Mut. Pharm. Co. v. Bartlett*, *supra*, 570 U.S. at p. 475 (preemption leaves state laws "without effect"); *Oneok, Inc. v. Learjet, Inc.* (2015) 575 U.S. 373, 376 (preemption "invalidate[s]" state laws).

[70] *Wyeth v. Levine* (2009) 555 U.S. 555, 565, quoting *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485.

[71] See *Murphy v. Nat'l Collegiate Athletic Ass'n*, *supra*, 138 S.Ct. at p. 1480.

[72] *English v. Gen. Elec. Co.* (1990) 496 U.S. 72, 78; see, e.g., *Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374 (applying express preemption clause in the Airline Deregulation Act of 1978).

[73] *Murphy v. Nat'l Collegiate Athletic Ass'n*, *supra*, 138 S.Ct. at p. 1480, internal quotation marks omitted; see also *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.* (1985) 471 U.S. 707, 713 (Congress's intent to occupy a legal field "may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation" or "where the field is one in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," internal quotation marks omitted).

[74] *English v. Gen. Elec. Co.*, *supra*, 496 U.S. at p. 79.

preemption), or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (obstacle preemption).[75]

### *Preemption under the Controlled Substances Act*

Congress expressly addressed the preemptive effect of the Controlled Substances Act in section 903 of title 21 of the United States Code. As we have previously explained, section 903 "allow[s] the states some freedom to continue the enforcement of their own narcotic laws."[76] Specifically, it provides that:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.[77]

As the California Court of Appeal has recognized, section 903 expressly "reject[s] . . . field preemption of state laws concerning controlled substances."[78] Instead, as the United States Supreme Court has observed, the statute "explicitly contemplates a role for the States in regulating controlled substances."[79]

As to what state laws are preempted, courts generally agree that the CSA incorporates the first sub-type of conflict preemption, addressing situations where it is impossible for a private party to comply with both state and federal law.[80] Courts

---

[75] *English v. Gen. Elec. Co.*, *supra*, 496 U.S. at p. 79, internal quotation marks omitted. Given that conflict preemption has two sub-types—impossibility and obstacle—some courts consider there to be "four species of federal preemption" in total. (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935.)

[76] 54 Ops.Cal.Atty.Gen. 57, 61 (1971).

[77] 21 U.S.C. § 903.

[78] *Cnty. of San Diego v. San Diego NORML*, *supra*, 165 Cal.App.4th at p. 819.

[79] *Gonzales v. Oregon*, *supra*, 546 U.S. at p. 251; see also *id.* at p. 270 (the limited scope of the CSA preemption clause "caution[s] against the conclusion that the CSA effectively displaces the States' general regulation of medical practice").

[80] See, e.g., *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 758-760; *People v. Crouse* (Colo. 2017) 388 P.3d 39, 42-43; *Musta v. Mendota Heights Dental Ctr.* (Minn. 2021) 965 N.W.2d 312, 321-327.

disagree, however, as to whether section 903 also incorporates the second sub-type of conflict preemption, addressing circumstances where state law stands as an obstacle to accomplishing the federal statute's purposes and objectives.[81]  One district division of the California Court of Appeal, for instance, has reasoned that, by expressly limiting preemption to a "positive conflict," Congress intended state laws to be preempted on impossibility preemption grounds alone.[82]  Other courts—including another division within the same district of the California Court of Appeal—have construed section 903 more expansively to incorporate obstacle preemption as well.[83]  We need not weigh in on this debate here.  Given that many courts have concluded that section 903 incorporates both sub-types of conflict preemption, there is a significant risk that a court considering a preemption challenge to SB 1326 would reach the same conclusion.  We will therefore analyze both impossibility and obstacle preemption.

### Impossibility preemption of SB 1326

We begin with impossibility preemption—a "demanding" standard to satisfy.[84]  As described above, the doctrine applies only if "it is impossible for a private party to comply with both state and federal requirements" in a given area.[85]  So, where "federal

---

[81] See *Appeal of Panaggio* (2021) 174 N.H. 89, 95-96 ("Some courts have ruled that, given the language in Section 903, the CSA preempts a state law only under impossibility preemption, and not under obstacle preemption. . . . Other courts have disagreed").

[82] See *Cnty. of San Diego v. San Diego NORML*, *supra*, 165 Cal.App.4th at p. 823 ("The phrase 'positive conflict,' particularly as refined by the phrase that 'the two [laws] cannot consistently stand together,' suggests that Congress did not intend to supplant all laws posing some conceivable obstacle to the purposes of the CSA, but instead intended to supplant only state laws that could not be adhered to without violating the CSA"); see also Mikos, *Preemption Under the Controlled Substances Act* (2013) 16 J. Health Care L. & Pol'y 5 (arguing that the CSA incorporates only impossibility preemption).

[83] See, e.g., *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at pp. 760-763; *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.* (9th Cir. 2017) 860 F.3d 1228, 1236; *United States v. Zadeh* (5th Cir. 2016) 820 F.3d 746, 751-752; *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.* (2010) 348 Or. 159, 176-178.  Although the U.S. Supreme Court performed an obstacle-preemption analysis under a federal statute with a similarly worded preemption clause, it is unclear whether the Court construed the clause to incorporate obstacle preemption or simply assumed, without deciding, that it did, before concluding that the state law at issue did not, in any event, pose an obstacle to accomplishing the federal statute's objectives.  (See *Wyeth v. Levine*, *supra*, 555 U.S. at pp. 573-581.)

[84] *Wyeth v. Levine*, *supra*, 555 U.S. at p. 573.

[85] *English v. Gen. Elec. Co.*, *supra*, 496 U.S. at p. 79; see also *Fla. Lime & Avocado*

16

law forbids an action that state law requires"—or vice versa—simultaneous compliance with both laws is impossible, and the state law is preempted.[86] For example, the Supreme Court has held that a state law requiring generic drug manufacturers to add warnings to their labels was preempted where federal law prohibited adding the warnings.[87]

Here, simultaneous compliance with state and federal law would not be impossible. Although the California law at issue would *authorize* interstate commercial cannabis activity as a matter of state law, it would not *require* any party to engage in that activity.[88] A private party could therefore "comply with both" California and federal law by simply "refraining from any" cannabis activity that crossed state lines.[89] For this reason, numerous courts have concluded that state laws that merely authorize and regulate intrastate cannabis distribution and possession are not preempted by the CSA under an impossibility analysis.[90] We see no reason why a court would reach a different conclusion in the context of interstate activities.

---

*Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142-143 ("A holding of federal exclusion of state law is inescapable . . . where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce").

[86] *Mut. Pharm. Co. v. Bartlett*, *supra*, 570 U.S. at p. 486.

[87] *Mut. Pharm. Co. v. Bartlett*, *supra*, 570 U.S. at p. 475; see *ibid.* ("Under the Supremacy Clause, state laws that require a private party to violate federal law are pre-empted and, thus, are without effect," internal quotation marks omitted).

[88] See *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at p. 759 (no impossibility preemption of California law legalizing medical cannabis use because it did not "require[] anything the CSA forbids").

[89] *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at p. 176; accord *Hyland v. Fukuda* (9th Cir. 1978) 580 F.2d 977, 980-981 (no conflict between federal law prohibiting felons from carrying guns and state law allowing such possession).

[90] See, e.g., *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at p. 176 (Oregon medical cannabis law); *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at pp. 758-760 (California medical cannabis law); *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at pp. 390-391 (Oklahoma ballot initiative to legalize recreational cannabis); *Ter Beek v. City of Wyoming* (2014) 495 Mich. 1, 12-14 (Michigan medical cannabis law). In contrast, courts have found impossibility preemption where they conclude that state law *requires* unwilling parties to violate the CSA. (See, e.g., *People v. Crouse*, *supra*, 388 P.3d at p. 42 [Colorado law required law enforcement to return resident's cannabis, thereby violating the CSA]; *Bourgoin v. Twin Rivers Paper Co., LLC* (Me. 2018) 187 A.3d 10, 18-22 [Maine law

17

### *Obstacle preemption of SB 1326*

As to obstacle preemption, the analysis is more complex and we cannot conclude that the risk is insignificant. The doctrine applies if California's legalization and regulation of interstate commercial cannabis activity would stand as an obstacle to accomplishing the CSA's objectives, which are "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances."[91] "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."[92] But obstacle-preemption "analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law."[93] Accordingly, "a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act."[94] Indeed, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[95]

---

required employer to subsidize employee's medical cannabis use, thereby violating the CSA].)

[91] *Gonzales v. Raich*, *supra*, 545 U.S. at p. 12.

[92] *Crosby v. Nat'l Foreign Trade Council* (2000) 530 U.S. 363, 373.

[93] *Chamber of Com. of U.S. v. Whiting* (2011) (plurality opin.) 563 U.S. 582, 607, internal quotation marks omitted. Although Justice Thomas did not join this section of the Court's opinion, his writings in other cases suggest that he would impose an even higher threshold for obstacle preemption—if he would continue to apply the doctrine at all. (See, e.g., *Wyeth v. Levine*, *supra*, 555 U.S. at p. 583 (Thomas, J., conc. in the judg.) [expressing "increasing[] skeptic[ism]" of "invalidat[ing] state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law"].)

[94] *Chamber of Com. of U.S. v. Whiting*, *supra*, 563 U.S. at p. 607, internal quotation marks omitted; see also *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.* (9th Cir. 2020) 959 F.3d 1201, 1212 ("The Supreme Court has found obstacle preemption in only a small number of cases").

[95] *Wyeth v. Levine*, *supra*, 555 U.S. at p. 565; see also *City of Columbus v. Ours Garage & Wrecker Serv., Inc.* (2002) 536 U.S. 424, 432; *CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 663-664 ("In the interest of avoiding unintended encroachment on the authority of the States, . . . pre-emption will not lie unless it is the clear and manifest purpose of Congress," internal quotation marks omitted).

In the cannabis context, courts are divided as to whether state laws that authorize and regulate intrastate cannabis cultivation, distribution, and possession pose an obstacle to accomplishing the CSA's objectives. Most courts have upheld such laws against preemption challenges, concluding that state-law authorization of intrastate cannabis activities does not interfere with federal enforcement of the CSA. In California, the Court of Appeal has upheld state laws legalizing cannabis for medical purposes against obstacle-preemption claims.[96] The Court of Appeal and the Northern District of California have likewise rejected obstacle-preemption challenges to laws *implementing* the State's regulatory regime—including state laws implementing an identification-card system for qualifying medical cannabis users, and local laws requiring a permit to operate medical cannabis dispensaries.[97] Outside of California, the Supreme Courts of Oklahoma, Michigan, and Arizona have similarly rejected preemption challenges to state laws legalizing and regulating cannabis for both medical and recreational purposes.[98]

But other courts and jurists have reached a different conclusion. In particular, the Oregon Supreme Court and several dissenting justices of the Oklahoma Supreme Court have reasoned that, by authorizing activities that federal law prohibits, state-law regulation of intrastate cannabis activities poses an obstacle to accomplishing the CSA's objectives.[99] The Minnesota Court of Appeals has reached a similar conclusion.[100] And one district division of the California Court of Appeal has likewise held that a local

---

[96] See *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at pp. 760-763; *Kirby v. Cnty. of Fresno* (2015) 242 Cal.App.4th 940, 963; *City of Garden Grove v. Superior Ct.* (2007) 157 Cal.App.4th 355, 380-386.

[97] See *Cnty. of San Diego v. San Diego NORML*, *supra*, 165 Cal.App.4th at pp. 826-828 (identification cards); *City of Palm Springs v. Luna Crest Inc.* (2016) 245 Cal.App.4th 879, 885-886 (city permitting requirements); *Joe Hemp's First Hemp Bank v. City of Oakland* (N.D. Cal. 2016) No. C 15-05053 WHA, 2016 WL 375082, at pp. *3-4 (city permitting requirements).

[98] See *Ter Beek v. City of Wyoming*, *supra*, 495 Mich. at pp. 14-18 (Michigan medical cannabis laws); *Reed-Kaliher v. Hoggatt* (2015) 237 Ariz. 119, 124-125 (Arizona medical cannabis laws); *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at pp. 391-393 (Oklahoma ballot initiative that would have legalized, regulated, and taxed recreational cannabis).

[99] See *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at pp. 176-186; *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at pp. 396-398 (Kane, J., dis.), 398-400 (Rowe, J., dis.).

[100] See *Haumant v. Griffin* (Minn. Ct. App. 2005) 699 N.W.2d 774, 780-781 (proposal to authorize medical cannabis distribution centers under city law was preempted by both state and federal law).

19

permitting regime for medical cannabis collectives was preempted—although the decision was later vacated when the California Supreme Court granted review and then dismissed the case as moot.[101]

Consistent with the authorities that have upheld state laws regulating intrastate cannabis activities, we believe there would be strong arguments that California's authorization and regulation of interstate cannabis commerce would not pose an obstacle to accomplishing the CSA's objectives. To begin with, nothing in California's law would interfere with the federal government's ability to enforce the CSA's prohibition on cannabis distribution. Although California would remove criminal sanctions for specified interstate cannabis activities under state law, it "is often the case that state law decriminalizes conduct that federal law still prohibits. That state prosecutions can no longer occur in no way bars federal prosecutions."[102] Nor would California in any way "undermine federal enforcement of [the CSA's] prohibition."[103] State law would not, for instance, interfere with any investigatory tools of federal law enforcement.[104]

To be sure, Congress might prefer that California retain and enforce its state-law prohibition on interstate cannabis commerce. But as the requestor explains, Congress

---

[101] See *Pack v. Superior Ct.* (2011) 132 Cal.Rptr.3d 633; *Pack v. Superior Ct.* (Cal. 2012) 283 P.3d 1159 (dismissing case as moot after city repealed ordinance).

[102] *Joe Hemp's First Hemp Bank v. City of Oakland*, *supra*, 2016 WL 375082, at p. *3; see also *City of Garden Grove v. Superior Ct.*, *supra*, 157 Cal.App.4th at p. 385 ("[T]here is no conflict based on the fact that Congress has chosen to prohibit the possession of medical marijuana, while California has chosen not to. California's statutory framework has no impact on the legality of medical marijuana under federal law"); *Ter Beek v. City of Wyoming*, *supra*, 495 Mich. at p. 15 (noting the right of "the people of the State of Michigan . . . to part ways with Congress" concerning the scope of criminal liability).

[103] *Ter Beek v. City of Wyoming*, *supra*, 495 Mich. at p. 16; see *Reed-Kaliher v. Hoggatt*, *supra*, 237 Ariz. at p. 124 ("[T]he statute does not prevent federal authorities from enforcing federal law—it merely provides a limited state-law immunity," internal quotation marks omitted).

[104] Compare *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, *supra*, 860 F.3d at p. 1236 (Oregon statute requiring a court order for federal officials to enforce a subpoena posed an obstacle to implementation of the CSA, which authorized the Attorney General to obtain "documents through a subpoena . . . without a court order"), with *United States v. California*, *supra*, 921 F.3d at p. 890 (California law limiting state law enforcement cooperation with federal immigration officials not preempted; "the choice of a state to refrain from participation cannot be invalid under . . . obstacle preemption where . . . it retains the right of refusal").

20

could not, consistent with the Constitution, *require* the State to do so.[105] "[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts" as a matter of state law.[106] For example, in *Murphy v. National Collegiate Athletic Association*, the Supreme Court invalidated a federal law that required States to maintain state-law prohibitions on sports gambling.[107] Congress, the Court explained, "may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'"[108] Likewise, here, Congress cannot prohibit California from repealing its state-law prohibition on interstate commercial cannabis activities.[109] Nor can Congress order the State to enforce the CSA's prohibition.[110] Accordingly, inasmuch as SB 1326 repeals California's prohibition of

---

[105] See Request for Opinion, at pp. 2-5.

[106] *Murphy v. Nat'l Collegiate Athletic Ass'n*, *supra*, 138 S.Ct. at p. 1477.

[107] *Murphy v. Nat'l Collegiate Athletic Ass'n*, *supra*, 138 S.Ct. at p. 1485.

[108] *Murphy v. Nat'l Collegiate Athletic Ass'n*, *supra*, 138 S.Ct. at p. 1477, quoting *New York v. United States* (1992) 505 U.S. 144, 161. The Court explained that the anti-commandeering principle "serves as one of the Constitution's structural protections of liberty," "promotes political accountability," and "prevents Congress from shifting the costs of regulation to the States." (*Id.* at p. 1477, internal quotation marks omitted.)

[109] Cf. 54 Ops.Cal.Atty.Gen., *supra*, at p. 61 ("[T]here is nothing in the Controlled Substances Act which requires the states to retain their existing laws and penalties regarding the use and possession of marijuana. For example, California could, consistent with the federal legislation, repeal all statutes prohibiting possession and use of marijuana").

[110] See *Murphy v. Nat'l Collegiate Athletic Ass'n*, *supra*, 138 S.Ct. at p. 1477 ("'The Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program,'" quoting *Printz v. United States* (1997) 521 U.S. 898, 935); see also *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at p. 761 ("Preemption theory . . . is not a license to commandeer state or local resources to achieve federal objectives"); *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at p. 392 (*Murphy* "reinforce[s] the . . . limits of [CSA] preemption"); *Conant v. Walters* (9th Cir. 2002) 309 F.3d 629, 646 (Kozinski, J., conc.) (the fact that individuals "may be more likely to violate federal law if the additional deterrent of state liability is removed may worry the federal government, but the proper response—according to *New York* and *Printz*—is to ratchet up the federal regulatory regime, *not* to commandeer that of the state"); *Cnty. of San Diego v. San Diego NORML*, *supra*, 165 Cal.App.4th at pp. 827-828 (rejecting obstacle-preemption challenge to state medical cannabis statute in part due to anti-commandeering concerns).

21

interstate commercial cannabis sales, that repeal cannot be said to pose an obstacle to accomplishing the CSA's objectives.

Of course, SB 1326 does not just remove California-law sanctions for interstate commercial cannabis activities, allowing such activities to be carried on free from any state supervision. As described above, it also requires licensing, tracking, and regulation of interstate sales under the State's comprehensive regulatory system. Cannabis products imported into the State would need to meet or exceed California's health and safety standards, thereby protecting consumers from potential contaminants and other health threats.[111] Imported cannabis that is sold within the State would be subject to restrictions on advertising and sales, thereby protecting minors and minimizing drugged driving and similar public health hazards.[112] And interstate cannabis commerce would be taxed, with the proceeds funding enforcement against illegal activities as well as health and safety research.[113]

As to these aspects of SB 1326—regulating and controlling interstate cannabis commerce—the preemption analysis is less clear. There are reasonable arguments, though, that, by licensing and regulating interstate cannabis sales, SB 1326 would not interfere with the federal government's ability to accomplish the CSA's objectives. In fact, comprehensive state regulation would arguably advance those objectives by minimizing the worst harms associated with illegal drug trafficking. The United States Department of Justice itself has suggested as much. In a 2013 memorandum, that Department outlined the federal priorities in enforcing the CSA, including preventing distribution of cannabis to minors, preventing cannabis revenues from funding "criminal enterprises," and minimizing "drugged driving and . . . other adverse public health consequences."[114] The Department concluded that state cannabis laws that "implement[] strong and effective regulatory and enforcement systems . . . may affirmatively address" these priorities.[115] Here, California's laws regulating interstate cannabis commerce

----

[111] See Bus. & Prof. Code, § 26303, subd. (a)(1).

[112] See Bus. & Prof. Code, § 26303, subd. (a)(2), (6), §§ 26150-26156, §§ 26070-26071, § 26140.

[113] See Bus. & Prof. Code, § 26306; Rev. & Tax Code, § 34010 et seq.; Rev. & Tax Code, § 34019; cf. *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at p. 393, fn. 7 ("Much of the excise tax revenue that would be collected [under the proposed Oklahoma law to legalize cannabis] would be directed to programs specifically designed to combat drug abuse," thereby "serv[ing] to aid one of the primary purposes of the CSA, not thwart it").

[114] Cole Memorandum, at pp. 1-2.

[115] Cole Memorandum, at p. 3. Although the Cole Memorandum was later revoked, (see Memorandum For All United States Attorneys from Jefferson B. Sessions, III, Attorney

22

would arguably be the type of "strong and effective regulatory and enforcement system[]" that could "affirmatively address" the CSA's core concerns.[116]

Indeed, if the CSA preempted California's efforts to license and regulate interstate cannabis activities, the result might be that those activities would be left entirely unregulated by the State. Tellingly, several preemption challenges in this area have been brought by parties seeking that very result: the ability to engage in cannabis commerce unhindered by any state or local regulation (albeit still subject to the federal prohibition).[117] As the California Court of Appeal observed in rejecting such an obstacle-preemption claim, "common sense suggests that a strong local regulatory regime" would "tend to prevent" the most harmful types of cannabis trafficking the CSA was designed to eliminate.[118] Similarly, here, SB 1326 arguably "creat[es] a tightly regulated . . . market" that would provide "greater support to the federal goals" than the alternative of eliminating all state-law restraints on interstate cannabis commerce—an alternative the

---

General, *Marijuana Enforcement* (Jan. 4, 2018)), the revocation memorandum did not express any disagreement with the Cole Memorandum on this commonsense point. Rather, it concluded that cannabis-specific guidance was simply "unnecessary" in light of the "well-established principles that govern all federal prosecutions." (*Ibid.*)

[116] Cole Memorandum, at p. 3. For example, the Legislature concluded that, by "providing legal and regulated channels for multistate commercial cannabis activities," the statute would bring more cannabis commerce "into the legal, regulated market" while "[p]reventing the illegal diversion of cannabis" from California to other States. (Stats. 2022, ch. 396 (SB 1326), § 5, subd. (a); see also Off. of Ass. Floor Analyses, 3d reading analysis of Sen. Bill No. 1326 (2021-2022 Reg. Sess.) Aug. 19, 2022, p. 4 [statement of bill sponsor that authorizing interstate activity is necessary "to stabilize the legal industry" while avoiding "considerable expansion of the illicit market"].) To the extent SB 1326 succeeds in reducing illicit cannabis trafficking, it could address several federal priorities—including preventing cannabis revenues from funding "criminal enterprises, gangs, and cartels," and preventing "violence and the use of firearms" in cannabis distribution. (Cole Memorandum, at pp. 1-2.)

[117] See *City of Palm Springs v. Luna Crest Inc.*, *supra*, 245 Cal.App.4th at pp. 881, 885-886; *Joe Hemp's First Hemp Bank v. City of Oakland*, *supra*, 2016 WL 375082, at pp. *3-4.

[118] *City of Palm Springs v. Luna Crest Inc.*, *supra*, 245 Cal.App.4th at pp. 885-886; see *Joe Hemp's First Hemp Bank v. City of Oakland*, *supra*, 2016 WL 375082, at p. *3 (local permitting scheme for medical cannabis dispensaries "appears to serve the goal of controlling the traffic in controlled substances, albeit to a weaker degree than criminal sanctions (but to a stronger degree than complete deregulation)").

23

State "clearly can" enact.[119]  For these reasons, a court could reasonably conclude that SB 1326 would not satisfy the "high threshold" for determining that a state law is invalid on obstacle-preemption grounds.[120]

Notwithstanding these valid legal arguments against obstacle preemption, there remains a not insignificant risk that a court would reach a different conclusion.  As noted above, some courts and jurists have determined that state laws authorizing and regulating cannabis activities do pose an obstacle to accomplishing the CSA's objectives.  Most notably, the Oregon Supreme Court has reasoned that state laws "[a]ffirmatively authorizing" medical cannabis use—"a use that federal law prohibits"—"stand[] as an obstacle to the implementation" of the CSA's purposes and objectives.[121]  The court analogized the CSA to a federal law "prohibit[ing] anyone under the age of 21 from driving."[122]  Given such a law, the court reasoned, a state law "authoriz[ing] anyone over the age of 16 to drive and giv[ing] them a license to do so" would pose an obstacle to Congress's objective of "keeping everyone under the age of 21 off the road."[123]  Similarly, the court concluded, a state law that "authorizes persons holding medical marijuana licenses to engage in conduct" that the CSA prohibits poses an obstacle to Congress's objective of preventing all types of cannabis use.[124]  Citing *Emerald Steel*, a

[119] Chemerinsky et al., *Cooperative Federalism and Marijuana Regulation* (2015) 62 UCLA L. Rev. 74, 112.

[120] *Chamber of Com. of U.S. v. Whiting*, *supra*, 563 U.S. at p. 607; see *Wyeth v. Levine*, *supra*, 555 U.S. at p. 565 (preemption requires evidence of "the clear and manifest purpose of Congress"); *Medtronic, Inc. v. Lohr*, *supra*, 518 U.S. at p. 485 ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt" state laws).

[121] *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at p. 178.

[122] *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at p. 182.

[123] *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at p. 182.

[124] *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at p. 182. The specific dispute in *Emerald Steel* was whether state law required an employer to accommodate an employee's medical cannabis use.  (See *id.* at p. 161.)  The court concluded that, to the extent that state law required as much, the law was preempted by the CSA.  (See *id.* at pp. 161, 178.)  Although the decision focused on an employment dispute, the court's reasoning could be construed more broadly to suggest that laws that authorize and regulate voluntary cannabis activities are also preempted.  (See *id.* at pp. 176-186; but see *Willis v. Winters* (2011) 350 Or. 299, 309, fn. 6 [cautioning against an overly broad reading of *Emerald Steel*; the decision "should not be construed as announcing a stand-alone rule that any state law that can be viewed as 'affirmatively authorizing' what federal law prohibits is preempted"].)  In the years since *Emerald Steel*,

24

federal district court in Colorado has held, in the context of a contract dispute, that "Colorado's marijuana laws are preempted by" the CSA as well.[125]

Three dissenting justices of the Oklahoma Supreme Court have similarly concluded that state ballot initiatives to legalize and regulate cannabis under state law would be preempted.[126] Echoing the Oregon Supreme Court, one justice reasoned that, by "affirmatively authoriz[ing] conduct the CSA expressly forbids," a state law proposal to "authorize[] the widespread production, sale, and use of" cannabis would "clearly present[] an obstacle" to accomplishing Congress's objectives of prohibiting cannabis "production, sale, and use."[127] Another justice reasoned that, by "sanction[ing] and licens[ing]" cannabis distribution and use, the State would allow such activities to "proliferat[e]"—making it "virtually impossible for federal law enforcement, operating with limited resources, to accomplish Congress's objective . . . to control" cannabis "production, sale, and use."[128] In addition, the Minnesota Court of Appeals has concluded that a local ballot measure to authorize medical cannabis distribution was preempted by the CSA, albeit in a decision with little analysis.[129]

In 2011, a district division of the California Court of Appeal similarly concluded that a city law licensing medical cannabis collectives was preempted by the CSA.[130] The court acknowledged that the State could eliminate its existing state-law prohibition on

we are not aware of any decisions adjudicating further preemption challenges to Oregon's cannabis laws.

[125] *Haeberle v. Lowden* (D. Colo. 2012) No. 2011CV709, 2012 WL 7149098, at p. *4. The court concluded that the parties' contract for the sale of cannabis products was therefore void as contrary to public policy. (*Id.* at p. *5.) No appeal was taken, and the decision does not appear to have been cited by any subsequent judicial authorities.

[126] See *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at pp. 396-398 (Kane, J., dis.), 398-400 (Rowe, J., dis.); *Tay v. Green* (2022) 508 P.3d 431, 436 (Kane, J., dis.), 436-438 (Rowe, J., conc. in part, dis. in part). In both cases, the Oklahoma Supreme Court majority concluded that the CSA would *not* preempt the proposed state law. (See *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at pp. 390-393; *Tay v. Green*, *supra*, 508 P.3d at p. 434.)

[127] *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at p. 397 (Kane, J., dis.).

[128] *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at p. 399 (Rowe, J., dis.).

[129] See *Haumant v. Griffin*, *supra*, 699 N.W.2d at pp. 780-781.

[130] See *Pack v. Superior Ct.*, *supra*, 132 Cal.Rptr.3d at p. 638.

25

cannabis activities without preemption concerns.[131]  But the law at issue also established a permitting regime, requiring medical cannabis businesses to pay the city an annual fee and participate in a lottery to obtain a business permit.  The court concluded that the law therefore went "beyond decriminalization into authorization," and was preempted.[132]  The decision was later vacated when the California Supreme Court granted review.[133]  But because the appeal was dismissed as moot after the city repealed the ordinance, the Supreme Court never weighed in on the Court of Appeal's analysis—leaving future California courts free to adopt similar reasoning.

In light of these decisions, we conclude that the risk of a court holding SB 1326 preempted is significant.  A court could adopt the Oregon Supreme Court's reasoning, for example, to conclude that SB 1326 frustrated the CSA's objectives by "[a]ffirmatively authorizing" interstate cannabis activities that "federal law prohibits."[134]  And a court could similarly adopt the view of one of the Oklahoma Supreme Court dissents that, by "sanction[ing] and licens[ing]" cannabis distribution, the State would allow interstate cannabis activities to "proliferat[e]"—making it "virtually impossible for federal law enforcement, operating with limited resources, to accomplish Congress's objective" to prohibit cannabis sales.[135]  Although these decisions concerned regulation of *intrastate* cannabis activities, similar reasoning could apply in the context of *interstate* sales.  And the fact that no court has yet considered preemption in the interstate context only further increases the risk here, as the validity of laws like SB 1326 remains untested.

Moreover, the United States has suggested that the CSA preemption analysis might depend, in part, on how state law is implemented and enforced "in practice."[136]  In briefing before the U.S. Supreme Court, the United States has argued that obstacle preemption of state cannabis laws could sometimes turn on "the practical efficacy of [the State's] regulatory system in preventing or deterring [state-law noncompliant] marijuana trafficking."[137]  If a future court evaluating a preemption challenge to SB 1326 adopted

---

[131] *Pack v. Superior Ct.*, *supra*, 132 Cal.Rptr.3d at pp. 651-652.

[132] *Pack v. Superior Ct.*, *supra*, 132 Cal.Rptr.3d at p. 652.

[133] See *Pack v. Superior Ct.*, *supra*, 283 P.3d at p. 1159.

[134] *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus.*, *supra*, 348 Or. at p. 178.

[135] *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at p. 399 (Rowe, J., dis.).

[136] Brief for the United States as Amicus Curiae, *Nebraska v. Colorado*, No. 144 Orig. (Dec. 2015), at p. 22.

[137] Brief for the United States as Amicus Curiae, *Nebraska v. Colorado*, No. 144 Orig., *supra*, at p. 22.

23-103

that view, its decision could depend on how effectively the statute's regulatory controls are ultimately enforced. That possibility only further increases the uncertainty at this stage, before the law has taken effect.

In sum, while there are strong arguments against preemption here, courts and jurists have divided over whether the CSA preempts laws regulating intrastate cannabis activities.[138] And no court has yet considered a preemption challenge to a law, like SB 1326, that authorizes interstate sales. Given the ongoing division of judicial authority and the lack of any directly relevant precedent, we cannot conclude that the risk of a future court deeming SB 1326 preempted is so low as to be not "significant."[139]

### *Likelihood of preemption litigation*

Looking beyond the substance of the preemption analysis, several comment letters advance a different basis for concluding that the legal risk here is minimal. They argue that, in practice, there is no "significant" risk that any party would sue the State to assert preemption of SB 1326. We cannot agree.

To begin with, commenters raise two reasons why the federal government would be unlikely to initiate a preemption suit. First, commenters point to the appropriations rider discussed above, which prohibits the United States Department of Justice from using appropriated funds to "prevent [States] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."[140] Courts have construed this language to bar the Justice Department "from spending money on actions that prevent" States from "giving practical effect to their state laws that authorize the . . . distribution . . . of medical marijuana."[141] That rider would appear to prohibit the Justice Department from challenging SB 1326 to the extent it authorizes interstate cannabis distribution for *medical* purposes. For this reason, the State's legal risk would be lower—in the short term—if it authorized interstate sales for medical uses

---

[138] See Congressional Research Service, State Legalization of Recreational Marijuana: Selected Legal Issues, at p. 16 (Jan. 13, 2014), https://crsreports.congress.gov/product/pdf/R/R43034/6 (as of Dec. 19, 2023) (given courts' "varying approaches," "the extent to which state marijuana provisions (whether medicinal or recreational) are preempted by the CSA is unsettled").

[139] Bus. & Prof. Code, § 26308, subd. (a)(4); see, e.g., Oxford English Dict. (updated through Sept. 2023) [defining "significant" as "worthy of attention"].

[140] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 531 (Dec. 29, 2022) 136 Stat. 4459; see *ante*, fn. 21.

[141] *United States v. McIntosh*, *supra*, 833 F.3d at p. 1176; see also *United States v. Bilodeau*, *supra*, 24 F.4th at pp. 712-713.

rather than for recreational purposes, where the rider does not apply. But even in the medical context, the rider is only temporary: it expires later this fiscal year.[142] And, as discussed above, we are not in a position to speculate about whether it will be renewed.

Second, commenters argue that the practical likelihood of a federal suit to challenge SB 1326 is no greater than the likelihood of a suit under current law.[143] The CSA, the commenters observe, makes no distinction between intrastate and interstate sales of controlled substances.[144] Rather, the statute contains a single, undifferentiated ban on distribution—which is based, in all cases, on Congress's power to regulate interstate commerce.[145] Accordingly, the commenters reason that, by authorizing interstate cannabis commerce, the State would not be exposing itself to any greater risk of suit than the risk already associated with the State's existing authorization of intrastate sales—authorization that, to date, the United States has never challenged.

But it remains possible that the federal government might view interstate cannabis distribution as posing a greater threat to federal priorities than existing intrastate activities. Interstate sales might be seen, for example, to create a larger risk of diversion to neighboring States, or to have a greater potential impact on national markets. For these or other reasons, the State's authorization of interstate sales could prompt a federal challenge, even though its existing laws authorizing intrastate sales so far have not. In any event, given our statutory charge to analyze only questions of law, we are not in a position to predict whether a current or future federal administration would decide to initiate legal action.

---

[142] See *ante*, fn. 21; see also *United States v. McIntosh*, *supra*, 833 F.3d at p. 1179 (although the rider "currently prohibit[s] [the Department of Justice] from spending funds," "Congress could appropriate funds" again "tomorrow").

[143] See Rural County Representatives Comment, at p. 7 (arguing that any legal risk to the State would not be the "result" of "state law authorization" under SB 1326 because the legal risk is no different than already exists today); California Cannabis Authority Comment, at p. 3; see also Request for Opinion, at p. 7 (because the CSA "does not distinguish between interstate and wholly intrastate activity," there is "no reason to conclude that [it] subjects a state to greater liability for legalizing and regulating commercial cannabis activity involving out-of-state licensees, as compared to legalizing and regulating wholly in-state commercial cannabis activity").

[144] See 21 U.S.C. § 841.

[145] See *Gonzales v. Raich*, *supra*, 545 U.S. at p. 17 (upholding Congress's constitutional authority to prohibit purely intrastate cultivation and use of cannabis given Congress's judgment that those activities "have a substantial effect on interstate commerce").

28

Turning to the possibility of preemption suits brought by parties other than the federal government, commenters contend that, as a matter of law, no other party *could* sue the State to allege preemption of SB 1326.[146] As these commenters observe, numerous courts have held that the Controlled Substances Act does not provide a cause of action for private parties to sue a State challenging its laws on preemption grounds.[147] And the States of Nebraska and Oklahoma were unsuccessful in attempting to sue Colorado to assert preemption of that State's laws authorizing cannabis use.[148]

But courts have allowed CSA preemption challenges to proceed in other settings. For example, the California Court of Appeal has held that California counties can sue the State to assert CSA preemption of state laws that impose obligations on the counties.[149] Preemption claims have also been adjudicated in disputes between private parties—for example, where state law required an employer to accommodate or reimburse an employee's medical cannabis use.[150] And CSA preemption has been raised in litigation between local jurisdictions and their residents—for example, where a county ordinance

---

[146] See *Rural County Representatives Comment*, at pp. 5-6; *California Cannabis Authority Comment*, at p. 2. The commenters did not dispute that the federal government could bring a preemption suit. (See generally *Safe Streets All. v. Hickenlooper* (10th Cir. 2017) 859 F.3d 865, 898 ["The Supreme Court has reaffirmed time and again that the United States is empowered to enforce the supremacy of federal law against preempted State action, and that it may obtain an injunction to that effect"].)

[147] See *Safe Streets All. v. Hickenlooper, supra*, 859 F.3d at pp. 903-904; *Sherrell v. California* (E.D. Cal. 2022) No. 2:22-CV-0275-KJM-KJN PS, 2022 WL 1138172, at p. *3 (collecting cases).

[148] Nebraska and Oklahoma first sought to initiate an original action in the United States Supreme Court, but the Court declined to exercise its original jurisdiction. (See *Nebraska v. Colorado* (2016) 577 U.S. 1211.) They then moved to intervene in pending litigation against Colorado before the Tenth Circuit, but that court held that it lacked jurisdiction to hear their claims. (See *Safe Streets All. v. Hickenlooper, supra*, 859 F.3d at pp. 909-913.)

[149] See *Cnty. of San Diego v. San Diego NORML, supra*, 165 Cal.App.4th at pp. 813-818 (allowing preemption challenge to state law requiring county to operate an identification-card system for medical cannabis users).

[150] See, e.g., *Emerald Steel Fabricators, Inc. v. Bureau of Lab. & Indus., supra*, 348 Or. at pp. 172-186; *Hager v. M&K Constr.* (2021) 246 N.J. 1, 28-42; *Appeal of Panaggio, supra*, 174 N.H. at pp. 92, 95-103; *Bourgoin v. Twin Rivers Paper Co., LLC, supra*, 187 A.3d at pp. 18-22; *Musta v. Mendota Heights Dental Ctr., supra*, 965 N.W.2d at pp. 321-328; *Garcia v. Tractor Supply Co.* (D.N.M. 2016) 154 F.Supp.3d 1225, 1230.

prohibited cannabis activities that state law allowed.[151]  Analogous conflicts could potentially develop in the context of SB 1326.  Although California might not be named as a defendant in certain types of suits, the State may elect to participate as an amicus or intervenor to defend its laws against an adverse judgment—as it has done in past CSA preemption litigation.[152]  In light of these possibilities, as well as the potential for a federal government suit, we cannot conclude that the likelihood of litigation involving the State is insignificant.

**Could state officials be federally prosecuted for implementing SB 1326?**

The request letter analyzes an additional risk:  that individual state officials who implement and administer SB 1326 could face federal criminal lability under the Controlled Substances Act.  For example, if a state official issued a license authorizing a California company to export cannabis, could that official be prosecuted if the company later distributed cannabis across state lines in accordance with the license?  In our view, state officials would have strong arguments against criminal liability for carrying out their official duties.  But we acknowledge that some state and federal authorities could support CSA liability for officials in these circumstances.[153]

To begin with, the risk of state officials being federally prosecuted could be seen as a "legal risk to the State of California" within the meaning of Business and Professions Code section 26308(a)(4).  To be sure, the State itself would not face prosecution; the

---

[151] See, e.g., *Kirby v. Cnty. of Fresno*, *supra*, 242 Cal.App.4th at pp. 947, 961-963; *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at pp. 756-763; see also, e.g., *City of Palm Springs v. Luna Crest Inc.*, *supra*, 245 Cal.App.4th at pp. 885-886 (preemption challenge to city permitting requirement for medical cannabis dispensaries); *Joe Hemp's First Hemp Bank v. City of Oakland*, *supra*, 2016 WL 375082, at pp. *3-4.

[152] See, e.g., *City of Garden Grove v. Superior Ct.*, *supra*, 157 Cal.App.4th at p. 364 ("[T]he Attorney General of California sought leave to file an amicus curiae brief" given that the City was "challenging the very constitutionality of California's medical marijuana laws"); cf. *White Mountain Health Ctr., Inc. v. Maricopa Cnty.* (Ariz. Ct. App. 2016) 241 Ariz. 230, 235-236 (State of Arizona intervened in preemption litigation between private company and county over zoning of cannabis business).

[153] Although we need not analyze the issue, we also note that cannabis activity prohibited by the CSA may qualify as "racketeering activity" under the Racketeer Influenced and Corrupt Organizations Act (RICO).  (See generally *Safe Streets All. v. Hickenlooper*, *supra*, 859 F.3d at p. 882.)  The Oklahoma Supreme Court has concluded that a proposed state law authorizing and regulating cannabis activities would not expose the State or its officials to RICO liability.  (See *In re State Question No. 807, Initiative Petition No. 423*, *supra*, 468 P.3d at pp. 394-396.)

individual officer—not the State—would face any criminal sanctions.  But the State's ability to implement SB 1326 and retain a workforce could be chilled and undermined if necessary state personnel faced federal prison sentences for doing their jobs.  The State might also expend resources defending its employees against criminal charges.[154]  If the State provided for an official's defense, then the criminal proceeding would involve a direct financial "conflict between the State . . . and the federal government," with the State funding the defense and the United States funding the prosecution.[155]  As noted, the requestor analyzes the prosecution of state officials as a relevant legal risk here.[156]

As to whether state officials could be successfully prosecuted, the requestor offers several reasons why they could not.  First, the requestor believes "it is doubtful" that a state official administering state cannabis laws would satisfy the elements for a CSA violation.[157]  "At least in the absence of activities that could constitute outright possession or distribution," the requestor explains, "any such liability would presumably be incurred under conspiracy or aiding-and-abetting theories."[158]  Both theories would require that the state official acted with the *intent* for another party to commit an act which is a CSA violation.[159]  In light of that requirement, courts have concluded in

---

[154] See Gov. Code, § 995.8 (the State "may provide for the defense of a criminal action . . . brought against an employee" if the action "is brought on account of an act or omission in the scope of [the employee's] employment" and the State "determines that such defense would be in the best interests of the [State] and that the employee . . . acted, or failed to act, in good faith, without actual malice and in the apparent interests of the" State); e.g., *Lexin v. City of San Diego* (2013) 222 Cal.App.4th 662, as mod. on denial of reh'g (Jan. 22, 2014).

[155] Sen. Floor, Hearing on Sen. Bill. No. 1326 (Aug. 25, 2022), Sen. Caballero, at 2:09:20 (statement of bill author that, under section 26308(a), "interstate cannabis agreements . . . cannot go into effect until there is an appropriate assurance that the agreements will not cause conflict between the State of California and the federal government").

[156] See Request for Opinion, at pp. 5-7.

[157] Request for Opinion, at p. 6.

[158] Request for Opinion, at p. 6.

[159] A person is liable for aiding and abetting a federal crime under 18 U.S.C. section 2 where they "(1) take[] an affirmative act in furtherance of [the] offense, (2) with the intent of facilitating the offense's commission." (*Rosemond v. United States* (2014) 572 U.S. 65, 71; see also *White Mountain Health Ctr., Inc. v. Maricopa Cnty.*, *supra*, 241 Ariz. at p. 246 ["[T]o prove aiding and abetting under federal law, it is necessary that a defendant . . . wishes to bring about [the venture], that he seek[s] by his action to make it succeed," internal quotation marks omitted].)  A conspiracy conviction under 18 U.S.C. section 371 requires proof that two or more individuals "reach[ed] an agreement with the

various situations that state and local officials would not incur CSA liability for implementing state laws regulating cannabis.[160]

But courts have sometimes held that the intent requirement for aiding and abetting or conspiracy is satisfied through knowing assistance—i.e., where "a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense."[161] Applying that view, the Supreme Courts of Minnesota and

---

specific intent that the underlying crime be committed by some member of the conspiracy." (*Ocasio v. United States* (2016) 578 U.S. 282, 288, italics and internal quotation marks omitted.)

[160] See *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at pp. 759-760 ("[G]overnmental entities do not incur aider and abettor . . . liability by complying with their obligations under the state medical marijuana laws"); *White Mountain Health Ctr., Inc. v. Maricopa Cnty.*, *supra*, 241 Ariz. at p. 246 ("[W]e fail to see how County officials who obey state law in passing a zoning ordinance . . . or processing applications for zoning clearance . . . can be liable as aiders or abettors"); *Joe Hemp's First Hemp Bank v. City of Oakland*, *supra*, 2016 WL 375082, at p. *3 (city permitting scheme for medical cannabis dispensaries did not create aiding-and-abetting liability "because the permit scheme *itself* does not violate the Controlled Substances Act but rather regulates certain entities that do"); *City of Garden Grove v. Superior Ct.*, *supra*, 157 Cal.App.4th at p. 368; *Cnty. of San Diego v. San Diego NORML*, *supra*, 165 Cal.App.4th at p. 825, fn. 13. The requestor also cites the Ninth Circuit's decision in *Conant v. Walters*. (See Request for Opinion, at p. 6.) There, the court held that a doctor would not necessarily incur aiding-and-abetting liability by "recommending" cannabis to a patient—a requirement for the medical use of cannabis under California law—even if the physician anticipates that the patient will use the recommendation to acquire cannabis. (*Conant v. Walters*, *supra*, 309 F.3d at pp. 635-636.) The court further stated, however, that aiding-and-abetting liability would attach if "the physician *intends* for the patient to use" the recommendation to obtain cannabis. (*Id.* at p. 635, italics added.) The court's analysis suggests that, in our circumstances, liability might turn on the specific facts concerning the state official's intent in carrying out their job functions.

[161] *Rosemond v. United States*, *supra*, 572 U.S. at p. 77; see LaFave, 2 Subst. Crim. L. (3d ed.) § 13.2(d), Knowing assistance or encouragement (describing division in case law concerning whether knowing assistance satisfies the mens rea for aiding and abetting); *id.* at fn. 113 (the question is "quite similar" for conspiracy). The issue could arise, for instance, where a "lessor rents with knowledge that the premises will be used to establish a bordello" (*id.*, § 13.2(d)), or "the owner of a gun store . . . sells a firearm to a criminal, knowing but not caring how the gun will be used" (*Rosemond v. United States*, *supra*, 572 U.S. at p. 77, fn. 8 [reserving the question of the store owner's liability for "incidentally facilitat[ing]," but not "actively participat[ing] in," the "criminal venture"]).

Maine have held that an employer who reimburses an employee for cannabis used to treat a work-related injury is liable for aiding and abetting the employee's CSA violation—even if state law required the employer to provide the reimbursement.[162] In the view of those courts, the employer would satisfy the intent requirement by actively facilitating the employee's cannabis use with full knowledge of the resulting CSA violation.[163] Here, a federal prosecutor could attempt to invoke a similar intent theory to argue, for example, that a state official who grants a cannabis export license to a private company is liable for knowingly facilitating the company's CSA violation.

Moreover, to the extent state officials personally handled cannabis in the course of their job duties, they may directly satisfy the elements of a CSA violation. The CSA broadly defines unlawful distribution as the intentional transfer of a controlled substance from one person to another.[164] Applying that definition, the Colorado Supreme Court has reasoned that if state law enforcement officials returned a resident's medical cannabis, the officials would thereby "distribute marijuana in violation of the CSA."[165] In the court's view, officials would be liable even though state law required them to deliver the cannabis because the CSA prohibits distribution "without regard to whether state law permits [cannabis] use."[166] Here, a prosecutor could similarly argue that if state officials handled and returned cannabis while implementing SB 1326—for example, to inspect

---

[162] See *Musta v. Mendota Heights Dental Ctr.*, *supra*, 965 N.W.2d at p. 327 ("[M]andating [the employer] to pay for [the employee's] medical cannabis . . . makes [the employer] criminally liable for aiding and abetting the possession of cannabis under federal law"); *Bourgoin v. Twin Rivers Paper Co., LLC*, *supra*, 187 A.3d at p. 19. Both courts concluded that the laws requiring reimbursement were therefore preempted under an impossibility analysis. Other courts have rejected preemption challenges to similar laws, concluding that employers would not incur aiding-and-abetting liability. (See, e.g., *Appeal of Panaggio*, *supra*, 174 N.H. at pp. 97-100.)

[163] See *Musta v. Mendota Heights Dental Ctr.*, *supra*, 965 N.W.2d at p. 325; *Bourgoin v. Twin Rivers Paper Co., LLC*, *supra*, 187 A.3d at p. 19.

[164] See 21 U.S.C. § 841, subd. (a)(1) (it is unlawful to "knowingly or intentionally" "distribute . . . a controlled substance"); 21 U.S.C. § 802, subd. (11) ("distribute" means "to deliver (other than by administering or dispensing) a controlled substance"); *id.*, § 802, subd. (8) ("delivery" means "the actual . . . transfer of a controlled substance").

[165] *People v. Crouse*, *supra*, 388 P.3d at p. 42.

[166] *People v. Crouse*, *supra*, 388 P.3d at p. 42. The California Court of Appeal, in contrast, has suggested that a state official could only "be found in violation of 21 U.S.C. § 841(a)(1) for distributing a controlled substance . . . if he or she intended to act as a drug peddler rather than a law enforcement official." (*City of Garden Grove v. Superior Ct.*, *supra*, 157 Cal.App.4th at p. 390.)

interstate shipments—they would thereby commit distribution under the CSA. Officials in this scenario might also satisfy the elements for unlawful possession.[167]

Second, the requestor argues that, even if state officials satisfied the requirements for a CSA violation, they would be shielded from liability by the CSA's immunity provision. As relevant here, section 885(d) of title 21 of the United States Code provides that "no civil or criminal liability shall be imposed by virtue of [the CSA] . . . upon any duly authorized officer of any State . . . who shall be lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances.[168] "This provision protects accepted law enforcement tactics such as sting . . . operations in which officers handle" drugs, or "the transfer of suspected drugs to . . . a clerk of court in the course of presenting evidence at trial."[169]

In the cannabis context, most courts have held that section 885(d) protects state and local officials who implement state regulatory laws—such as by granting zoning permits, or returning a resident's cannabis—even if the official's actions would otherwise constitute a CSA violation.[170] But the Colorado Supreme Court has concluded otherwise, construing section 885(d) to provide immunity only if an official's actions would *not* otherwise violate the CSA.[171] Given the division of authority in this area, it would be

---

[167] See 21 U.S.C. § 844, subd. (a) (prohibiting possession of a controlled substance); 21 U.S.C. § 841, subd. (a)(1) (prohibiting possession with intent to distribute a controlled substance).

[168] 21 U.S.C. § 885, subd. (d). The provision similarly immunizes "any duly authorized *Federal* officer lawfully engaged in the enforcement of [the CSA]." (*Ibid.*, italics added.)

[169] *United States v. Cortes-Caban* (1st Cir. 2012) 691 F.3d 1, 20-21.

[170] See *White Mountain Health Ctr., Inc. v. Maricopa Cnty.*, *supra*, 241 Ariz. at p. 246 (section 885(d) immunizes local officials who implement state medical cannabis laws by "promulgating reasonable regulations" and "processing applications for . . . zoning permits"); *City of Garden Grove v. Superior Ct.*, *supra*, 157 Cal.App.4th at p. 390 (where state law required police officers to return a resident's cannabis, "the police would be entitled to immunity under" section 885(d) against any charge of CSA distribution); *State v. Okun* (Ariz. Ct. App. 2013) 231 Ariz. 462, 466; *State v. Kama* (2002) 178 Or.App. 561, 565; *Smith v. Superior Ct.* (Cal. Super. Ct. App. Div. 2018) 28 Cal.App.5th Supp. 1, 6.

[171] *People v. Crouse*, *supra*, 388 P.3d at pp. 42-43. The court emphasized that section 885(d) applies only to officers who are "lawfully" engaged in the enforcement of state law, concluding that conduct is "lawful" only if it complies with both state and federal law, including the CSA. (*Id.* at p. 43.) Applying that construction, the court held that if a state official returned a resident's cannabis (as required by state law), section 885(d) would not shield the official from liability because returning the cannabis would

uncertain whether officials who implemented SB 1326 would receive immunity under section 885(d) if their actions otherwise gave rise to CSA liability.

Finally, it is not clear that the United States Department of Justice would choose to prosecute state officials for actions taken to implement state laws. We are not aware of a single such prosecution ever occurring—even during periods when the federal government more actively enforced the CSA against cannabis activities.[172] If a future federal administration ever decided to increase CSA enforcement, the historical record suggests it would be more likely to do so by either prosecuting private individuals who commit clear-cut CSA violations, or by seeking to enjoin enforcement of state law on preemption grounds. And the congressional appropriations rider discussed above would currently limit the Department's ability to prosecute state officials who implemented SB 1326 in the medical-cannabis context.[173] Still, we cannot predict whether the rider will be renewed, or whether a future federal administration might adopt a more aggressive approach by prosecuting state officials. Indeed, two U.S. Attorneys have previously suggested that such a prosecution could be possible.[174]

---

constitute distribution under the CSA. Several dissenting justices disagreed, construing section 885(d) to provide immunity whenever state officials are acting pursuant to state-law authority. (*Id.* at p. 44.) The dissent reasoned that the majority's view "leads to absurd results" because officers would not receive immunity in cases where section 885(d) was clearly intended to apply—such as "when a law enforcement officer provides marijuana to a target in a sting operation." (*Id.* at p. 45.) Indeed, the majority's reading would appear to render section 885(d) a nullity, as the provision would shield officials from CSA liability only when they had no liability to begin with.

[172] See *City of Garden Grove v. Superior Ct.*, *supra*, 157 Cal.App.4th at p. 390 ("As a practical matter, . . . it seems exceedingly unlikely that federal prosecutors would ever attempt to haul a local constable into federal court for complying with a state judicial order calling for [the officer to return] a qualified patient's medical marijuana. We are not aware of a single instance in which this has ever occurred"); *White Mountain Health Ctr., Inc. v. Maricopa Cnty.*, *supra*, 241 Ariz. at p. 246 (finding "no evidence of a credible threat of prosecution" for "County officials who obey state law in passing a zoning ordinance . . . or processing applications for zoning clearance").

[173] See *ante*, fn. 21; *United States v. McIntosh*, *supra*, 833 F.3d at pp. 1175-1179.

[174] In 2011, the U.S. Attorneys for the Eastern and Western Districts of Washington sent a letter to the Governor of Washington concerning legislative proposals to license cannabis cultivation and sales. (See *Pack v. Superior Ct.*, *supra*, 132 Cal.Rptr.3d at p. 650, fn.27, citing U.S. Attorney Jenny A. Durkan and U.S. Attorney Michael C. Ormsby, letter to Governor Christine Gregoire, Apr. 14, 2011.) The letter stated that "state employees who conduct[] activities mandated by the . . . legislative proposals . . . would not be immune from liability under the CSA." (*Ibid.*)

In sum, if state officials were federally prosecuted for implementing SB 1326, we believe they would have strong arguments that they cannot be held liable for carrying out their official duties. But given the authorities that could support CSA liability in these circumstances, some legal risk would remain. We therefore conclude that the possibility of state officials facing criminal prosecution only further increases the State's legal risk from authorizing interstate cannabis sales.

## CONCLUSION

We conclude that state-law authorization for commercial cannabis activity between out-of-state licensees and California licensees could "result in significant legal risk to the State of California under the federal Controlled Substances Act" within the meaning of Business and Professions Code section 26308(a)(4).